[CHANCERY.]

CARNEAL and others, *Appellants*, v. BANKS, *Respondent*.

BANKS, *Appellant*, v. CARNEAL and others, *Respondents*.

The joinder of improper parties, as citizens of the same State, &c. will not affect the jurisdiction of the Circuit Courts in equity, as between the parties who are properly before the Court, if a decree may be pronounced as between the parties who are citizens of the same State.

A decree must be sustained by the allegations of the parties, as well as by the proofs in the cause, and cannot be founded upon a fact not put in issue by the pleadings.

1825.

Carneal
v.
Banks.

Banks
v.
Carneal.

The treaty of 1778, between the United States and France, allowed the citizens of either country to hold lands in the other ; and the title, once vested in a French subject, to hold lands in the United States, was not devested by the abrogation of that treaty, and the expiration of the subsequent convention of 1800.

Bill to rescind a contract for the exchange of lands dismissed under the special circumstances of the case.

*Feb. 20th.*　　THESE causes was argued by Mr. *Jones,* for Banks, and by Mr. *Bibb,* for Carneal and others.

*Feb. 25th.*　　Mr. Chief Justice MARSHALL delivered the opinion of the Court.

These appeals are from a decree of the Circuit Court for the District of Kentucky, in which Carneal's heirs were decreed to pay Henry Banks 2,500 dollars, for failing to perform a contract entered into between Thomas Carneal, their ancestor, and the said Henry Banks.

The bill filed by Henry Banks, charges, that his agent, Cuthbert Banks, entered into a contract with Thomas Carneal, whereby he agreed to transfer to Carneal the right of the said Banks in 30,000 acres of land purchased by him from John Harvie, for which right said Carneal " agrees to give a tract of 2,000 acres of land on Green river, patented for Philip Philips, which was sold out of a tract of 22,100 acres, by Philips, to Michael Lacassaign, deceased, by said Lacassaign to said Carneal, on the 30th of July, 1797, for which land said Carneal is to make a general warranty deed whenever thereunto required."

The bill further charges, that Carneal was guilty of fraud in pretending to have a good title

to the said 2,000 acres of land, the whole being covered with better titles, and in representing the land as much more valuable than it really is. The bill prays, that the contract may be rescinded, and that the plaintiff may be reinstated in his rights to the said 30,000 acres of land, or have the value thereof in damages. And that the heirs of John Harvie, deceased, in whom the legal title to the said 30,000 acres remains, may be decreed to convey the same to him.

The heirs of T. Carneal deny all fraud in his representation of the value of the land sold to the plaintiff, and insist on their ability to convey the same. They admit, that the deed from Lacassaign to him was not recorded within the time limited by law, one of the three subscribing witnesses then required for its proof, having died before it was offered to the Court. In consequence of this circumstance, Carneal, in 1779, instituted a suit in Chancery against Lacassaign, to perfect his title, which abated by his death. The law being so changed as to admit deeds to record on the oath of two subscribing witnesses, this deed was recorded in 1814, and the defendants are willing to convey, if directed so to do.

The defendants farther state, that the plaintiff's original claim on the said 30,000 acres of land, was to only a moiety thereof, the other moiety being the property of the locator, which has been transferred to the defendants. The said Banks assigned the survey to J. Harvie, that the patent might issue in his name, in trust for the person entitled to the locator's moiety. and the title still

remains in Harvie's heirs, encumbered by debts due from Banks to Harvie, and by an obligation in which Harvie was bound to Thomas Madison, as surety for Banks for the conveyance of military lands northwest of the Ohio. To obtain a title from Harvie, the said Carneal, in September, 1799, bound himself to pay the debt due from Banks, with Harvie as his security, to Madison, on condition that Banks would deliver him military land warrants to the amount of 4,300 acres; and it was expressly stipulated, that Carneal should retain the title to the said 2,000 acres of land, until Banks should perform this contract. He requires the plaintiff to show how he has performed it. They understand that Harvie's heirs have a claim on the estate of their ancestor, of which they know nothing certain, and aver, that the title to the locator's moiety of the said 30,000 acres of land, remains in the said heirs. The defendants, then, pursuing a practice authorized by law in the State Courts of Kentucky, pray that their answer may be received as a cross bill; and that Harvie's heirs, as well as Banks, may be made defendants to it, and may answer it; and that the whole controversy may be settled.

On the 20th of September, 1799, J. H. conveyed to T. C. the moiety of the said patent for 30,000 acres, which had been sold by the said Banks to Carneal.

On the same day, the following agreement was entered into:

" Thomas Carneal agrees to pay John Preston, or John Harvie, 3,200 acres of military land,

lying on the northwest side of the river Ohio, surveyed on or before the 10th day of October, 1795, to satisfy a bond executed by the said John Harvie, as security for Henry Banks, to Thomas Madison, deceased, dated the 6th day of December, 1795; provided the said Carneal shall receive from Cuthbert Banks, in Kentucky, 4,300 acres of military continental land warrants, within ninety days after the said Carneal shall make demand of them of Cuthbert Banks, in Lexington, in Kentucky; and provided the said Carneal shall not receive the warrants, he will not, afterwards, be bound to take them unless he pleases. Henry Banks agrees that he will furnish the said 4,300 acres of military land warrants, through the agency of Cuthbert Banks, within the time above mentioned ; and if he fails to do so, and the said Thomas Carneal satisfy the bond for military land due the estate of the said Thomas Madison, as aforesaid, by the said H. B. and J. H., in such case the said H. B. obliges himself to satisfy and pay off the said obligation, according to its true value, upon the application of the said Thomas Carneal, or still to give the 4,300 acres of military land warrants, at the option of the said Carneal." Signed by H. B. and T. C.

There are letters from J. H. to T. C., the last dated the 3d of March, 1802, not long before his death, urging T. C. to satisfy the debt to the estate of T. M.

The answer of Banks to what is termed the cross bill, states, that he has sued Madison's representatives in Virginia, to compel them to re-

ceive a compensation in money for the military lands he was bound to pay, there being no lands which are within the description of the obligation; and that the suit is still depending.

The parties agree that the debt to Madison is not satisfied, and that the representatives of J. H. hold an obligation of T. C., deceased, for payment of the same, or as indemnification to H., as referred to in the answer and pleadings in the same.

In May, 1819, the plaintiff filed an amended bill, stating that Michael Lacassaing was an alien, and never became a citizen of the United States. That his deed, being proved by only two witnesses, could not pass the title to T. C. That Carneal knew his title to be defective when he sold to Banks. That Lacassaing left no heirs in this country, and has made some person in France his residuary legatee. That there are debts and judgments against him to a large amount, which bind the land.

The answer admits Lacassaing to have been a Frenchman, but not an alien. That he emigrated early to this country, before and at the close of the war, and continued a citizen till his death. They insist that the legal title passed, by the deed of the said Lacassaing, and deny that the land is encumbered.

The Circuit Court was of opinion, that the contract between Banks and Carneal required that the tract of 2,000 acres, which Carneal bound himself to convey to Banks, should be a tract lying on Green river, and that as the land did

not touch the river in any part, it did not corres- pond with, and could not satisfy the contract. The Court therefore directed an issue to ascertain the average value of 2,000 acres, part of the land granted to Philips, to bind on the river; and on receiving the verdict of the jury, directed its amount, with interest thereon, to be paid to the plaintiff.

From this decree both parties have appealed; and the counsel for Carneal's heirs assign for error,

1. That the Circuit Court had no jurisdiction.

2. That there is no allegation that the land does not, in point of location, fit the description of it in the contract.

3. That the plaintiff has no right to relief in equity, until he releases Carneal's representatives from their undertaking to Harvie; and Carneal's heirs have a right in equity to retain the land as an indemnity for that undertaking.

4. If Banks can recover on the agreement, his remedy is at law.

5. The decree against the heirs personally is erroneous. They are not named in the contract, and the statute of Kentucky does not authorize a suit against them personally in such a case.

1. The objection to the jurisdiction of the Court is founded on this; that Banks states himself, in his bill, to be a citizen of Virginia, and does not state the heirs of Harvie to be citizens of Kentucky. They are, in truth, citizens of Virginia.

**1825.**

Carneal
v.
Banks.

Banks
v.
Carneal.

Joinder of improper parties, how far affecting jurisdiction of the Court.

If the validity of this objection, so far as respects Harvie's heirs, be unquestionable, it cannot affect the suit against Carneal's heirs, unless it be indispensable to bring Harvie's heirs before the Court, in order to enable it to decree against Carneal's heirs. This is not the case. Harvie had conveyed to Carneal, Banks' moiety of the 30,000 acre tract of land, so that his heirs have no lien upon it; and they never had a claim on the 2,000 acre tract. They are made defendants by Banks, under the idea that the title to the land sold by him to Carneal was in them; but this is a mistake. The title to that land was in Carneal's heirs; and Banks can have no claim on the locator's moiety, the title to which seems to have been retained by Harvie. The bill, therefore, as to Harvie's heirs, may be dismissed, without in any manner affecting the suit against Carneal's heirs. That they have been improperly made defendants in his bill, cannot affect the jurisdiction of the Court as between those parties who are properly before it. It is the matter contained in what is termed the cross bill, which may bring Harvie's heirs into the cause; and in that suit they would be proper parties, were they to appear, because the plaintiffs in it are all citizens of Kentucky, and the defendants appear to be all citizens of Virginia.[a]

Misrepresentation not averred in the bill. Decree must be secundum allegata.

2. The second error assigned has more weight. The variance between the location of the land

[a] *Vide ante*, Wormley v. Wormley, and note *a*. Vol. VIII. p. 451. Kerr v. Watts, vol. VI. p. 558. Cameron v. M'Roberts, vol. III. p. 591. Russel v. Clark, 7 *Cranch*, 92.

sold by Carneal to Banks, and the description of it in the contract, is not averred in the bill, and is, consequently, not put in issue. The maxim, that a decree must be sustained by the allegations of the parties, as well as by the proofs in the cause, is too well established to be disregarded. It is, on this fact only, that the Circuit Court has rescinded the contract, and we do not think there is any other in the cause which would justify its being set aside. The alleged alienage of Lacassaign constitutes no objection. Had the fact been proved, this Court decided, in the case of *Chirac* v. *Chirac*, (reported in 2 *Wheat. Rep.* 259.) that the treaty of 1778, between the United States and France, secures to the citizens and subjects of either power the privilege of holding lands in the territory of the other; and the omission to record the deed in time, may involve the title in difficulty, but does not annul it. That circumstance might oppose considerable obstacles to a decree for a specific performance, if sought by Carneal's heirs, but does not justify a decree to set aside the contract. There is no subsequent purchaser, nor is it certain, that the title which Carneal's heirs can make, will or can ever be disturbed by the creditors of Lacassaign. In such a state of things, there is, perhaps, no sufficient cause for the interference of a Court of equity. Did this Court, then, concur with the Circuit Court in its construction of the contract between Banks and Carneal, the decree could not be affirmed, because the parties have not put that fact in issue. But the majority is rather dis-

posed to the opinion, that the words " lying on Green river," as used in this contract, with reference to a specific conveyance expressly mentioned, which contains within itself information which could not fail to suggest the idea that the land did not, in fact, bind on the river, may be satisfied with the land actually conveyed by Lacassaign to Carneal. The omission of Banks to charge Carneal with a misrepresentation in this respect, countenances this explanation. At all events, the fact, if relied upon by him, ought to have been put in issue, so as to give Carneal's heirs an opportunity of controverting it, and of bringing before the Court such facts as might shed light upon it.

Were this construction to be established, and were there no equitable objections to allowing Banks the full benefit of his contract, a specific performance might be decreed; but the bill seeks to rescind the contract, and contains no prayer for general relief.

There are, too, on the part of Carneal's heirs, weighty objections to such a decree at this time.

3. The third error assigned is, that Banks has no right to relief in equity until he releases Carneal's representatives from their undertaking to Harvie; and Carneal's heirs have a right in equity to retain the title to the 2,000 acres of land, as an indemnity for that undertaking.

The testimony on this part of the cause is far from being satisfactory.

The contract of the 20th of September, 1799, is expressed in such vague terms as to leave it in

some measure doubtful whether Carneal would not have been discharged from the obligation it imposed, on the failure of Cuthbert Banks to deliver the military land warrants for which it stipulates within ninety days after they should be demanded in Lexington. But it does not appear that they have ever been demanded; and the fact that Harvie's conveyance of the land sold by Banks to Carneal, was executed on the same day with this contract, goes far in showing, that the parties understood the obligation of Carneal, to be absolute. The subsequent letters of Harvie to Carneal, show his opinion, that the obligation of the contract continued; and the admission of Banks, in the cause, goes to the same point. The Court must, therefore, consider Carneal's heirs as still liable for the debt due from Banks, with Harvie as his security, to Madison's estate.

It is alleged, that Banks agreed, that the title to the 2,000 acres of land should remain in Carneal as an indemnity for this undertaking; but this allegation is totally unsupported by evidence.

Carneal's heirs also charge, that they, or some of them, have purchased the interest of the locator in the 30,000 acre tract, and that Harvie's heirs retain the title till Madison's claim shall be adjusted; but of this there is no proof.

Since, however, the legal title to the land sold by Carneal to Banks, remains in the heirs of the vendor, the Court is not satisfied that equity will force it from them, or compel them to make compensation in money for any breach of the contract.

1825.

M'Cormick
v.
Sullivant.

until Banks shall indemnify them for the undertaking of their ancestor on his account.

It is unnecessary to proceed farther in the examination of this case, because the Court is of opinion, that for the errors already stated, the decree of the Circuit Court ought to be reversed, and the bill be dismissed without prejudice.

*Decree reversed.*